UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

RANDY RUSSELL YBARRA,

            Plaintiff,

    v.                                            CAUSE NO. 3:18-CV-404 DRL-MGG

WEXFORD MEDICAL, DOCTOR
MARTHAKIS, and DIANE THEWS,

            Defendants.

OPINION AND ORDER

Randy Russell Ybarra, a prisoner without a lawyer, is proceeding in this case on

five claims against three defendants: (1) "against Diane Thews in her individual capacity

for compensatory and punitive damages for denying him medical treatment for his

chronic eczema and psoriasis in violation of the Eighth Amendment;" (2) "against

Wexford Medical for compensatory and punitive damages for enforcing a policy or

practice of denying needed non-prescription medical products to indigent inmates in

violation of the Eighth Amendment;" (3) "against Wexford Medical for injunctive relief

to obtain needed non-prescription medical products when he is indigent as required by

the Eighth Amendment;" (4) "against Dr. Marthakis in her individual capacity for

compensatory and punitive damages for denying him medical treatment for glass in his

right foot in violation of the Eighth Amendment;" and (5) "against Dr. Marthakis in her

official capacity for injunctive relief to obtain medical treatment for glass in his right foot

as required by the Eighth Amendment." Dr. Marthakis, Nurse Thews, and Wexford

Medical filed a joint motion for summary judgment. ECF 149. Mr. Ybarra filed a response, and the defendants filed a reply. ECF 152, 153. The summary judgment motion is now fully briefed and ripe for ruling.

BACKGROUND

In January 2017, Mr. Ybarra was ordered to have insoles for his shoes that were to be kept throughout the life of the item. ECF 150-2 at 1. On February 26, 2017, an x-ray was taken of Mr. Ybarra's right foot after he complained that there were shards of glass in his foot. *Id.* at 2. The x-ray was reviewed by radiologist Dr. Robert Mehl of Meridian Radiology, who determined that the x-ray images did not demonstrate any fractures, dislocations, or abnormalities in Mr. Ybarra's foot. *Id.*

Mr. Ybarra responds that the x-ray was not performed by Dr. Mehl, but by x-ray technician Jackie Asher. ECF 152 at 2. The defendants reply that the medical records show that the images were reviewed and interpreted by Dr. Mehl. ECF 153 at 2. Because the defendants have not offered evidence disputing that Technician Asher performed the x-rays, and Mr. Ybarra has not offered evidence disputing that Dr. Mehl reviewed and interpreted the x-ray images, the court accepts both as undisputed. Whether the x-ray was taken by Technician Asher or Dr. Mehl is not material.

Mr. Ybarra also asserts that, following the x-rays, he was transported to an outside clinic in March 2017 to be examined and fitted for custom orthotic shoes at the request of Dr. Joseph Thompson. ECF 152 at 2; ECF 152-1 at 1, 3-5. The defendants do not dispute this fact, and the court accepts it as undisputed. ECF 153 at 1-2.

In November 2017, Mr. Ybarra saw a nurse to address his complaint of burning pain in his right foot, and he requested an orthopedic evaluation and new x-ray of his foot. ECF 150-2 at 46. The nurse referred Mr. Ybarra to see an onsite provider to address his concerns. *Id.* at 49. On December 11, 2017, Mr. Ybarra met with Dr. Thompson and reported that he had pain in his right foot since having surgery in 1994. *Id.* at 43-45. Mr. Ybarra stated that he was unable to bend some of his toes and requested insoles and orthotic shoes. *Id.* at 43. It was explained to Mr. Ybarra that he would have to purchase these items from the commissary. *Id.* At that time, Mr. Ybarra was receiving prescriptions for Flomax, Gabapentin, Minerin topical cream, Prozac, Remeron, and Selsun Blue shampoo. *Id.* at 45.

On February 5, 2018, Dr. Marthakis communicated an order to renew Mr. Ybarra's prescriptions for Remeron, Prozac, Mobic, Gabapentin, Flomax, Minerin cream, and Selsun Blue shampoo. *Id.* at 41. Mr. Ybarra responds that he was first examined by Dr. Marthakis in April 2018. ECF 152 at 3. Because Mr. Ybarra has presented no evidence to refute that Dr. Marthakis renewed his prescriptions in February 2018, the court accepts as undisputed that Dr. Marthakis renewed Mr. Ybarra's prescriptions in February 2018 and first examined Mr. Ybarra in April 2018.

On April 4, 2018, Nurse Thews educated Mr. Ybarra on ways to manage his pain. ECF 150-2 at 35. A few days later, Mr. Ybarra submitted a request for new orthotic shoes; and Nurse Daniel Lunde advised Mr. Ybarra that he would not receive new shoes unless his current pair was in severe disrepair. *Id.* at 31. On April 24, 2018, Mr. Ybarra again asked for renewal of his custom orthotic shoes. *Id.* at 27. Dr. Marthakis did not believe

that Mr. Ybarra needed new shoes because he was on medication to treat his foot pain and recommended that Mr. Ybarra obtain arch supports or shoe inserts from the commissary for additional comfort. *Id.* at 28. The court accepts these facts as undisputed.

On June 3, 2018, Mr. Ybarra presented to medical reporting that the cortisone cream that he had received for a rash was helping but that he would like a Benadryl injection to alleviate the itching overnight. *Id.* at 25. Mr. Ybarra received a 50 mg Benadryl injection in his right deltoid muscle to assist with the rash. *Id.* On June 4, 2018, Mr. Ybarra presented to medical with a rash on his buttocks, legs, knees, and abdomen. *Id.* at 22-24. Nurse Thews provided him with ten days' worth of Bactrim tabs and instructed him to avoid the sun and drink plenty of water. *Id.* at 24. Additionally, Mr. Ybarra's hydrocortisone cream was "reordered" because he reported that he was "almost out of cream." *Id.* Mr. Ybarra received the hydrocortisone cream on June 5, 2018. *Id.* at 20; ECF 150-4 at 3. Mr. Ybarra responds that he was not receiving hydrocortisone cream prior to June 3, 2018, as indicated by the medical records, but first received the cream on June 5, 2018. ECF 152 at 4. The medical records suggest that Mr. Ybarra was receiving hydrocortisone cream prior to June 5, 2018, as they state that Mr. Ybarra reported that the cream "helped" on June 3, 2018, and that he was "almost out of cream" on June 4, 2018. ECF 150-2 at 24-25. However, the records do not clearly indicate when Mr. Ybarra began receiving hydrocortisone cream. Therefore, the court accepts as undisputed that Mr. Ybarra received hydrocortisone cream on June 5, 2018. Any dispute regarding whether Mr. Ybarra received hydrocortisone cream prior to that date is immaterial.

On June 29, 2018, Mr. Ybarra met with Nurse Lunde and requested a new order of Minerin cream, stating that his prescription had run out and he could not afford items out of the commissary because he was indigent. *Id.* at 17-19. Nurse Lunde saw that Mr. Ybarra had recently purchased $186 worth of items from the commissary and advised him that he could purchase the lotions that he desired from the commissary to treat any further skin issues. *Id.* at 18-19. Mr. Ybarra responds that the defendants have offered no evidence that he spent $186 in the commissary in June 2018, and submits records demonstrating that he spent $183 on items in the commissary in February 2018. ECF 152 at 5-6; ECF 152-1 at 23. The defendants reply that they never stated that Mr. Ybarra spent $186 in June 2018, but that Nurse Lunde reviewed records in June 2018 that indicated that Mr. Ybarra was not indigent. ECF 153 at 3. The court accepts as undisputed that Mr. Ybarra spent $183 on items in the commissary in February 2018, and that Nurse Lunde reviewed Mr. Ybarra's commissary records in June 2018.

Later that same day on June 29, 2018, Dr. Marthakis met with Mr. Ybarra regarding his complaint of retained glass in his right foot. ECF 150-2 at 13-15. Dr. Marthakis noted that a radiologist had previously examined an x-ray of Mr. Ybarra's right foot and had reported finding a boney heel spur but had made "no mention" of a foreign object. *Id.* at 13. Dr. Marthakis ordered a second x-ray of Mr. Ybarra's right foot, along with an x-ray of his spine. *Id.* at 15. Dr. Marthakis issued Mr. Ybarra Tylenol and crutches to assist with his foot pain and determined to wean him off his prescribed Neurontin because a nurse reported that he had been "cheeking" the medication. *Id.* On June 30, 2018, radiologist Dr. Daniel Altman with Meridian Radiology reviewed a second

x-ray of Mr. Ybarra's right foot. *Id.* at 9. Dr. Altman concluded that the second x-ray showed no evidence of any foreign object in Mr. Ybarra's foot. *Id.* Based on the x-ray results, Dr. Marthakis decided to continue weaning Mr. Ybarra off Neurontin and starting him on Naproxen. *Id.* at 10. The court accepts these facts as undisputed.

On July 12, 2018, Dr. Marthakis met with Mr. Ybarra to discuss the x-rays. *Id.* at 3-6. Dr. Marthakis discontinued the order for the crutches after she received reports that Mr. Ybarra had been using them inappropriately and had not been relying on them. *Id.* at 3. Mr. Ybarra agreed to try Pamelor as an alternative to Neurontin to assist with his foot pain, and Dr. Marthakis ordered Mobic as a substitute for the Naproxen to see if it would better assist with the pain control. *Id.* at 5. Dr. Marthakis also advised Mr. Ybarra that he could obtain more comfortable shoes and shoe inserts from the commissary. *Id.* Mr. Ybarra responded that he could not purchase the items because he was indigent, and Dr. Marthakis informed Mr. Ybarra that his commissary records indicated that he was not indigent and had the capacity to purchase the items. *Id.* Dr. Marthakis also assessed Mr. Ybarra for the rash on his buttocks, which appeared to be resolving. *Id.* at 6. Dr. Marthakis ordered a two-week extension of Mr. Ybarra's prescription for hydrocortisone cream and denied his request for Minerin cream, as Minerin cream is used for moisturizing purposes and Dr. Marthakis saw no indication that Mr. Ybarra needed that cream. *Id.* The court accepts these facts as undisputed.

On August 24, 2018, Mr. Ybarra requested a new tube of hydrocortisone cream for his eczema and the rash on his buttocks and legs. *Id.* at 50-52. The medical provider identified that the rash was present in multiple areas of Mr. Ybarra's body and provided

him with a tube of hydrocortisone cream. *Id.* at 51-52. A few days later, Mr. Ybarra came back to medical regarding the rash and was advised to continue with the hydrocortisone cream and to keep the area clean and dry. *Id.* at 53-54. The court accepts these facts as undisputed.

On August 31, 2018, Mr. Ybarra had an appointment with Dr. Marthakis and reported continued concerns with his rash. *Id.* at 56-58. Dr. Marthakis ordered Mr. Ybarra to begin receiving Doxycycline for one month. *Id.* at 58. Mr. Ybarra also received antibiotic ointment and Tylenol to help with pain. *Id.* On September 20, 2018, Dr. Marthakis ordered another month of the Doxycycline. *Id.* at 59-62. Because Mr. Ybarra was taking Prozac, Dr. Marthakis discontinued Mr. Ybarra's prescription for Pamelor and began a low dose of Trileptal for the pain in his foot. *Id.* at 61. The court accepts these facts as undisputed.

On January 2, 2019, Dr. Marthakis met with Mr. Ybarra regarding his foot pain. *Id.* at 71. Dr. Marthakis renewed the orders for Trileptal and Tylenol and added Mobic. *Id.* at 73. Dr. Marthakis also consulted Mr. Ybarra regarding his rash, renewed a prescription for coal-tar shampoo, and advised Mr. Ybarra that she would request selenium sulfide lotion for him to use on his scalp. *Id.* During the month of January, Mr. Ybarra missed several doses of his prescribed Tylenol, Trileptal, and Mobic. *Id.* at 74. The court accepts these facts as undisputed.

On March 1, 2019, Mr. Ybarra reported to medical complaining of a rash, but an examination found that the rash was looking "much better" and was only "mildly present." *Id.* at 76. Mr. Ybarra received hydrocortisone cream for continued treatment of the rash. *Id.* at 77. Two weeks later, Mr. Ybarra continued to experience a rash and was

given a Solumedrol intramuscular injection into his left deltoid. *Id.* at 78. Mr. Ybarra also complained that his scalp was still itchy and that the coal-tar shampoo was not helping. *Id.* at 80, 82. Because Dr. Marthakis' request for selenium sulfide lotion had been denied, she advised Mr. Ybarra to purchase anti-dandruff shampoo from the commissary. *Id.* at 82. The court accepts these facts as undisputed.

On June 7, 2019, Dr. Marthakis met with Mr. Ybarra for a chronic care visit and addressed his concerns about his eczema. *Id.* at 84-87. Mr. Ybarra reported that he was having breakouts and that he had been unable to purchase over-the-counter anti-dandruff shampoo from the commissary because he was indigent. *Id.* at 84, 86. Dr. Marthakis prescribed a triamcinolone ointment to be used daily for the rash and renewed the order for coal-tar shampoo. *Id.* at 86. The court accepts these facts as undisputed.

Dr. Marthakis examined Mr. Ybarra again on July 17, 2019. *Id.* at 88-90. Mr. Ybarra reported that he had been using another inmate's hair grease to assist with his itchy scalp, which had improved his dandruff. *Id.* at 88. Dr. Marthakis advised Mr. Ybarra that he had a combination of eczema on his scalp line and his right knee and a small amount of discoloration on his buttocks. *Id.* at 89. Dr. Marthakis renewed an order for Doxycycline. *Id.* Mr. Ybarra also had a prescription for a topical steroid to help with the rash and was again instructed to purchase anti-dandruff shampoo from the commissary. *Id.* The court accepts these facts as undisputed.

## STANDARD

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Federal Rule of Civil Procedure 56(a). A genuine issue of material fact exists when "the evidence is such that a reasonable [factfinder] could [find] for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To determine whether a genuine issue of material fact exists, the court must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003). A party opposing a properly supported summary judgment motion may not rely merely on allegations or denials in its own pleading, but rather must "marshal and present the court with the evidence she contends will prove her case." *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). "[I]nferences relying on mere speculation or conjecture will not suffice." *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 407 (7th Cir. 2009). Summary judgment "is the put up or shut up moment in a lawsuit." *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008).

## ANALYSIS

Under the Eighth Amendment, inmates are entitled to constitutionally adequate medical care. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To establish liability, a prisoner must satisfy both an objective and subjective component by showing: (1) his medical need was objectively serious; and (2) the defendant acted with deliberate indifference to that medical need. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To be held liable for deliberate indifference to an inmate's medical needs, a medical professional must make a decision

that represents "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008).

Furthermore, a prisoner is not entitled to demand specific care, nor is he entitled to the "best care possible." *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). "Whether and how pain associated with medical treatment should be mitigated is for doctors to decide free from judicial interference, except in the most extreme situations." *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996). When medical professionals have provided some level of care for a prisoner's medical condition, to establish deliberate indifference the prisoner must show that "the defendants' responses to [his condition] were so plainly inappropriate as to permit the inference that the defendants intentionally or recklessly disregarded his needs." *Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008). A mere disagreement with medical professionals about the appropriate treatment does not amount to an Eighth Amendment violation. *Ciarpaglini v. Saini*, 352 F.3d 328, 331 (7th Cir. 2003).

A.      *Motion Requesting Consideration of Information in Final Judgment.*

At the outset, on April 16, 2021, Mr. Ybarra filed a "motion requesting information be considered into final judgment," asserting that the defendants altered his medications to deny him treatment after this lawsuit was filed. ECF 185. Specifically, Mr. Ybarra asserts that the defendants replaced his prescription for Gabapentin with a less effective medication and prescribed him Trileptal, which has known side effects that could cause "permanent health issues." *Id.* at 2. Mr. Ybarra also asserts that these changes to his

medication occurred "after I began passing out vomiting." *Id.* at 2-3. The defendants

oppose the motion. ECF 186. Here, Mr. Ybarra's allegations in this motion are relevant to

his injunctive relief claim against Dr. Marthakis. For this reason, the court grants the

motion and considers the information for that claim.

> B.    *Claims Against Dr. Marthakis.*

Mr. Ybarra is proceeding against Dr. Marthakis on one claim "for compensatory

and punitive damages for denying him medical treatment for glass in his right foot" and

on one claim "for injunctive relief to obtain medical treatment for glass in his right foot."

ECF 122 at 6. Mr. Ybarra asserts in his complaint that Dr. Marthakis was deliberately

indifferent to his complaints of glass in his foot because she refused to examine his foot

or provide him with any treatment. ECF 115 at 3-5. He argues that the x-ray images

"clearly show" two foreign bodies in the arch of his foot that "even a lay person can see,"

and that Dr. Marthakis continues to "deny the clear presence of" foreign bodies in his

foot. ECF 152 at 2-3.

Here, no reasonable jury could determine that Dr. Marthakis was deliberately

indifferent to Mr. Ybarra's complaints of glass in his foot. Dr. Marthakis provided

extensive treatment to Mr. Ybarra's foot. There is no evidence that the treatment was

outside her professional judgment. *See Jackson*, 541 F.3d at 697. A radiologist also

determined in February 2017 that an x-ray of Mr. Ybarra's right foot was negative for any

abnormal findings. ECF 150-2 at 2. Dr. Marthakis nevertheless treated Mr. Ybarra's foot

pain and prescribed him various pain medications, including Neurontin, Naproxen,

Mobic, Pamelor, and Tylenol. Dr. Marthakis also issued Mr. Ybarra crutches until she

received reports that he was not using the crutches appropriately. *Id.* at 3. Dr. Marthakis

then ordered a second x-ray in June 2018, and a second radiologist determined that the

x-ray showed "no evidence" of a glass piece. *Id.* at 3, 9. Although Mr. Ybarra states that

the x-ray images "clearly show" two foreign bodies, he has not provided any evidence to

contradict the radiologists' conclusions that both x-rays came back negative. ECF 152 at

3. The court acknowledges that the x-ray images show two faint spots near the arch of

Mr. Ybarra's foot, but there is no evidence that these spots indicate a foreign body or

abnormality. Two independent radiologists unaffiliated with the defendants concluded

that the images showed no foreign objects in Mr. Ybarra's foot. ECF 150-2 at 2, 9. Because

there is no evidence of glass in Mr. Ybarra's foot, he cannot receive an injunction to treat

it. Additionally, Dr. Marthakis continued to treat Mr. Ybarra's symptoms of foot pain,

and there is no evidence that that treatment she provided was outside the scope of her or

reasonable medical judgment.

Lastly, Mr. Ybarra's allegations in his "motion requesting information be

considered into final judgment"—that the defendants replaced his prescription for

Gabapentin with a less effective medication and prescribed him Trileptal—do not show

deliberate indifference by Dr. Marthakis, as Mr. Ybarra has not provided any evidence

that the changes were not based on Dr. Marthakis' professional judgment or outside

reasonable medical judgment. ECF 185 at 2. In sum, though Mr. Ybarra disagrees with

Dr. Marthakis' treatment methods, the record contains no evidence by which a reasonable

jury could conclude that Dr. Marthakis' treatment was "plainly inappropriate." *See Hayes*,

546 F.3d at 524; *Ciarpaglini*, 352 F.3d at 331. For these reasons, summary judgment is warranted in favor of Dr. Marthakis on these claims.

      C.    *Claims Against Nurse Thews.*

Mr. Ybarra was granted leave to proceed against Nurse Thews on one claim "for compensatory and punitive damages for denying him medical treatment for his chronic eczema and psoriasis." ECF 122 at 5.[1]  Specifically, Mr. Ybarra asserts in his complaint that Nurse Thews refused to provide him with Minerin cream, a non-prescription moisturizer, for the treatment of his chronic eczema and psoriasis even though he is indigent and unable to purchase it or an alternative from the commissary. ECF 115 at 3-4.

Nurse Thews submits an affidavit (ECF 150-4) in which she attests that, on June 4, 2018, Mr. Ybarra presented to medical with a rash on his buttocks, legs, knees, and abdomen. ECF 150-4 at 3. Nurse Lunde contacted Nurse Thews regarding possible treatment options for Mr. Ybarra's rash, and Nurse Thews instructed Nurse Lunde to provide Mr. Ybarra with Bactrim tabs and to advise Mr. Ybarra to avoid the sun and drink plenty of water. *Id.* Mr. Ybarra was also prescribed hydrocortisone cream, which he received on June 5, 2018. *Id.*

Here, no reasonable jury could determine that Nurse Thews was deliberately indifferent to Mr. Ybarra's skin conditions, as the medical records show that Nurse Thews

---

[1] "Chronic diseases are defined broadly as conditions that last 1 year or more and require ongoing medical attention or limit activities of daily living or both." Center for Disease Control and Prevention, *About Chronic Diseases* (2021), https://www.cdc.gov/chronicdisease/about/index.htm. "Chronic diseases generally cannot be prevented by vaccines or cured by medication, nor do they just disappear." MedicineNet, *Definition of Chronic Disease* (2021), http://www.medicinenet.com/script/main/art.asp?articlekey=33490.

provided treatment to Mr. Ybarra that was based on her medical judgment. *See Jackson*, 541 F.3d at 697. Mr. Ybarra asserts that his exhibits "show inconsistent evidence" to Nurse Thews' claim that she provided him with Bactrim tabs on June 4, 2018, but the medical records that Mr. Ybarra attaches do not contradict this claim. ECF 152 at 5; ECF 152-1 at 15-18. Otherwise, Mr. Ybarra does not directly dispute any of Nurse Thews' affirmations or explain how Nurse Thews was deliberately indifferent to his skin conditions. *See* ECF 152. Mr. Ybarra has not offered any evidence to refute Nurse Thews' affirmations that she always provided Mr. Ybarra with any medication that had been prescribed to him and that the treatment that she provided to Mr. Ybarra was based on her medical training and judgment. ECF 150-4 at 3-4. For these reasons, summary judgment is warranted in favor of Nurse Thews on this claim.

> D.     *Claims Against Wexford Medical.*

Mr. Ybarra is proceeding against Wexford Medical on one claim "for compensatory and punitive damages for enforcing a policy or practice of denying needed non-prescription medical products to indigent inmates" and on one claim "for injunctive relief to obtain needed non-prescription medical products when he is indigent." ECF 122 at 6. Specifically, Mr. Ybarra asserts that Wexford Medical has a policy of denying needed non-prescription medications to indigent inmates and that, pursuant to that policy, they have failed to provide him with non-prescription orthotic shoes, Minerin cream, and anti-dandruff shampoo. ECF 115 at 3-9; ECF 152 at 10-11.

A private company performing a state function, such as Wexford Medical, can be held liable to the same extent as a municipal entity under *Monell v. Dep't of Soc. Servs. of*

*City of New York*, 436 U.S. 658 (1978). *See Rice v. Corr. Med. Servs.*, 675 F.3d 650, 675 (7th Cir. 2012) (*Monell* framework applies to private company providing medical care at correctional facility). Under *Monell*, a municipality may only be held liable for constitutional violations caused by the municipality through its own policy, practice, or custom. *Monell*, 436 U.S. at 694. To recover under *Monell*, a plaintiff must establish that: (1) he suffered a deprivation of a federal right (2) as a result of an express municipal policy, a widespread custom, or a deliberate act of a decision-maker with final policymaking authority for the municipality that (3) was the proximate cause of his injury. *King v. Kramer*, 763 F.3d 635, 649 (7th Cir. 2014). Thus, "a municipality cannot be liable under *Monell* when there is no underlying constitutional violation by a municipal employee." *Sallenger v. City of Springfield Ill.*, 630 F.3d 499, 504 (7th Cir. 2010).

Here, there is no evidence by which a reasonable factfinder could determine that (1) Wexford Medical has a policy, practice, or custom of denying needed non-prescription medication to indigent inmates, or (2) Mr. Ybarra suffered a deprivation of a federal right as a result of that policy. *See King*, 763 F.3d at 649; *Sallenger*, 630 F.3d at 504. Instead, the evidence shows that Wexford Medical's physicians and nursing staff provided Mr. Ybarra with constitutionally adequate treatment and medication for each of his conditions. In addition, they advised him that he could purchase additional over-the-counter medications from the commissary if he wanted anything more. Regarding Mr. Ybarra's skin conditions, he was given several steroid injections and received prescriptions for hydrocortisone cream, antibiotic ointments, Doxycycline, and coal-tar shampoo. Regarding Mr. Ybarra's foot pain, he was prescribed various pain medications

and issued crutches even though two x-rays had come back negative for any abnormalities in his foot. Mr. Ybarra states that he desired additional over-the-counter items to treat his conditions, but he has not shown that these over-the-counter items were medically necessary. Thus, summary judgment is warranted in favor of Wexford Medical on these claims.

For these reasons, the court:

(1) GRANTS Randy Ybarra's "motion requesting information be considered into final judgment" (ECF 185);

(2) GRANTS the defendants' summary judgment motion (ECF 149); and

(3) DIRECTS the clerk to enter judgment in favor of the defendants and against Randy Ybarra.

SO ORDERED.

May 25, 2021

_s/ Damon R. Leichty_
Judge, United States District Court